# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIMBERLY BAILEY,<br><br>                       Movant,<br>  vs.<br><br>UNITED STATES OF AMERICA,<br><br>                       Respondent. | CASE NO. 00-CR-01242-JM<br>CIVIL NO. 00-CV-00155-JM<br><br>ORDER DENYING MOTION<br>TO VACATE, SET ASIDE, OR<br>CORRECT SENTENCE PURSUANT<br>TO 28 U.S.C. 2255 |

Movant Kimberly Bailey ("Bailey) moves to vacate, set aside, or correct her sentence pursuant to 28 U.S.C. §2255 ("Motion"). Respondent United States of America opposes the motion. Pursuant to Local Rule 7.1(d)(1), this matter is appropriate for decision without oral argument. For the reasons set forth below, the Motion is denied in its entirety. The Clerk of Court is instructed to close the file.

## BACKGROUND

**Pretrial Proceedings**

In April 2000, a federal grand jury returned a superseding indictment charging Bailey with conspiring to kidnap, murder and maim a person in a foreign country in violation of 18 U.S.C. §956(a)(1) (Count 1), kidnaping in violation of 18 U.S.C. §1201(a)(1) (Count 2), and murder for hire in violation of 18 U.S.C. §1958(a)(Count 5). At the time of indictment, Bailey was represented by attorney James Warner. In July 2001, the United States filed under seal an ex parte motion regarding a potential conflict between Bailey and Mr. Warner. Ultimately,

1  by September 2001, Mr. Warner withdrew as counsel of record and Bailey retained Philip
2  DeMassa as her counsel.

3  On October 17, 2001 codefendant John Krueger pleaded guilty to a second superseding
4  information charging him with conspiracy to kidnap a person in a foreign country in violation
5  of 18 U.S.C. §956(a)(1). The plea agreement included a cooperation provision.

6  The court granted several continuances in order to allow Bailey and her counsel to
7  adequately prepare for trial and to resolve pretrial motions. Trial commenced on June 18, 2002
8  and, on July 15, 2002, the jury convicted Bailey of all three crimes. The jury did not reach a
9  unanimous decision on whether or not the victim, Richard Post, had been murdered. On
10 August 27, 2003, Bailey was sentenced to life imprisonment on Counts 1 and 2, to run
11 concurrently, and ten years imprisonment on Count 5, to run concurrent with Counts 1 and 2.

12 **Overview of the Government's Case**

13 The United States called about ten witnesses, including undercover FBI Agent Nicholas
14 McKean, Svetlana Ogorodnikova, co-defendant John Krueger, and several of victim Richard
15 Post's children and friends. The United States also played for the jury the entire video and
16 audio tape of the transaction whereby Bailey paid the undercover FBI agent $10,000 cash to
17 have codefendant Krueger and others killed. The Government also played portions of audio
18 tapes in which Bailey told Svetlana Ogorodnikova that she paid thousands of dollars to have
19 Richard Post kidnaped and killed in Mexico and described how it was carried out.

20 **Overview of Bailey's Case**

21 The defense vigorously cross-examined all of the government's witnesses, especially
22 Svetlana Ogorodnikova and John Krueger. The defense also called approximately 18
23 witnesses in its case-in-chief, including Bruce Perlowin, Sandra Armendariz, Ben Harroll,
24 Randy Binter, Dr. Bruce Shelton, and Jay Walker. Through these witnesses, Bailey
25 significantly impeached Svetlana Ogorodnikova and co-defendant John Krueger. Bailey also
26 sought to show that she did not cause the victim Richard Post to disappear and that Post,
27 Ogorodnikova, Perlowin, and others were attempting to poison her.
28 / / /

**The Evidence at Trial**

Viewing the evidence in the best light for the Government, in late 1997 Bailey employed Intellisource, an investigative firm owned and operated by Richard Post, to investigate the loss of money she invested in Canada. TR 542. By way of background, Bailey owned a business that sold "black boxes" which reportedly cured various illnesses, including cancer. In 1998 Bailey and Post became romantically involved. TR 393.

In August of 1998, John Krueger, one of Post's employees, was in charge of managing Bailey's business. At about that time, Krueger informed Bailey that Post was embezzling money from her and had commenced a romantic relationship with another woman. TR 396. Upon hearing that Post was both embezzling money and cheating on her, Bailey became emotionally upset and asked Krueger to contact his friend, Humberto Iribe, to arrange to kidnap Post. TR 549. Krueger and Bailey developed a plan to get even with Post for the unfair way they felt he was treating them and to recover money he supposedly stole from Bailey. It was understood that Post would have to be hurt in order to persuade him to tell Bailey what she wanted to know. TR 552. On the same day, Krueger contacted Iribe who informed Krueger that the kidnaping would cost $50,000.

In mid-August 1998, Bailey and Krueger met with Iribe at Horton Plaza, a shopping center in San Diego, California, to discuss the kidnaping plans. At that meeting, Krueger excused himself and left Bailey and Iribe alone for about one hour in order to discuss the details of the kidnaping scheme. TR 555-56. Once the meeting was over, all three walked back to their parked cars and Iribe informed Krueger and Bailey that he needed $2,000 to purchase scrambled radios and stolen cars in order to carry out the kidnaping in Mexico. TR 558.

Following the meeting, Bailey told Krueger about the basic details of the plan. Bailey was responsible for the $50,000 payment as well as luring Post to Mexico, because Iribe would not kidnap Post in San Diego. In order to carry out the plan, on August 20, 1998, Bailey arrived at Post's office and traveled with him to Tijuana, Mexico. Later that day, Krueger received a phone call from Bailey stating that the kidnaping had taken place in Tijuana, in front

of a pharmacy. TR 568. Krueger then spoke with Iribe who asked him to come to Tijuana because there was a problem with the money. TR 570. On the same day, Iribe told both Bailey and Krueger that he would beat up Post in order to get him to tell where the money was hidden. TR 574-75. Krueger also represented to Iribe that the $10,000 payment shortfall would be taken care of within twenty four hours. TR 576.

Bailey, Krueger, and Iribe also discussed an alibi for Bailey because she had been the last person seen with Post. TR 578. They created a plan whereby they would force Post to leave decoy voicemail messages – one at Post's office and the other on Krueger's phone. The decoy message stated that Post had taken a trip to Mexico City. TR 578-79. Defendants Krueger and Iribe forced Post to leave the message several times before they decided he sounded credible.

On August 21, 1998, Krueger went to the Intellisource office and was informed that Post had left a message there, stating that he had traveled to Mexico City. TR 598. Krueger also spoke with Iribe that day and Iribe informed Krueger that Post had been beaten but denied taking any money from Bailey. Iribe also told Krueger that Bailey was in Mexico and wanted to speak with Post herself. TR 600. Bailey told Iribe that she would not pay the final $10,000 unless she was able to talk with Post. TR 604.

On August 23, 1998, Bailey met with Krueger in San Diego and told him that she had seen Post and didn't like the fact that he looked beaten up. TR 606. Bailey also said she told Iribe not to kill Post but to build an underground house where he could live. TR 606. On August 24, 1998, Bailey returned to Mexico and, the next day, Iribe told Krueger that Post had been killed and that Bailey agreed with the decision to kill Post. On August 25, 1998 Krueger and Bailey met with two of Post's children and told them that he had gone to Mexico City. A few days later, Bailey told Krueger that she had to pay an additional $10,000 as a disposal fee for Post's body. TR 618. Bailey said that she paid Iribe both the $10,000 disposal fee as well as the additional $10,000 still owing from the kidnaping. TR 618. Bailey also indicated that she paid two people $100 each to make a video tape saying they had seen Post at the airport in Tijuana.

Following the kidnaping and killing of Post, Krueger and Bailey continued to have a business relationship. TR 631. By the end of 1998, the relationship between Krueger and Bailey deteriorated and reached the point where Krueger sought to foreclose on a trust deed in Bailey's name. Krueger had forged Bailey's signature to a trust deed in an attempt to collect money.

In June of 1999, Svetlana Ogorodnikova, a former spy for the Soviet Union, and her husband moved to Bailey's ranch as caretakers. Bailey moved back to the ranch and became friends with Ogorodnikova. Bailey related to Ogorodnikova the kidnaping of Post. Bailey also told her how she squeezed Post's fingers with pliers in order to try to get him to talk. TR 1052. Bailey also told her that when Iribe told her they could not build the underground house, Bailey told him to "do what you have to do, kill." TR 1054.

After Bailey moved to Texas later in 1999, the FBI visited Bailey's ranch looking for her. Ogorodnikova told the FBI Agents about her conversations with Bailey regarding Post. The agents asked Ogorodnikova to tape record phone conversations with Bailey. During the taped conversations, Bailey asked about getting poison and hiring a hit man. TR 1072-73.

In December 1999, Bailey returned to San Diego to meet with an individual she believed to be an assassin. TR 1115. The "hit man" was actually an undercover FBI agent. Bailey told the hit man that she wanted to kill three people. She agreed to pay $10,000 and provided the hit man with the identity and location of each of the three individuals. TR 313.

On July 17, 2002 the jury convicted Bailey on all counts. The jury did not reach a unanimous decision on whether or not the victim, Richard Post, had been murdered.

**Post-Conviction Proceedings**

Following trial, Bailey sought appointment of new counsel. On August 22, 2002, following a <u>Faretta</u> hearing, the court granted Bailey's motion for self-representation and appointed attorney Bernie Skomal, Esq. as standby counsel. Sentencing was originally scheduled for November 8, 2002. However, Bailey filed dozens of motions and requested multiple continuances which ultimately led to her sentencing on August 20, 2003. Bailey was sentenced to life imprisonment on Counts 1 and 2, to run concurrently, and ten years

imprisonment on Count 5, to run concurrent with Counts 1 and 2. At the time of sentencing the court found, by unrebutted clear and convincing evidence that Richard Post had been murdered.

On September 2, 2003, Bailey filed a Notice of Appeal. The Court of Appeals declined to allow Bailey to represent herself on direct appeal and appointed Appellate Counsel. Ultimately, on October 12, 2004 Bailey's convictions and sentence were affirmed.

In order to prosecute the present Motion, Bailey has filed more than 30 motions and requests. Those motions included requests for change of venue, discovery, and recusal of the undersigned. The motions were denied.

## DISCUSSION

Bailey raises four grounds for relief. Each is discussed in turn.

### Ground One: Ineffective Assistance of Counsel and Conflict of Interest

Bailey contends that she was deprived of her Fifth and Sixth Amendment rights when trial counsel failed to adequately investigate and develop evidence to create a reasonable doubt with the jury; failed to object to a tainted jury pool; failed to expose perjury of informants; failed to notify the court that she fired her trial counsel in the middle of the trial; and failed to allow her to testify. Bailey also contends that her counsel threatened to influence the undersigned if she exposed the embezzlement of monies by her prior counsel. Finally, she contends that appellate counsel was ineffective for failure to use unidentified evidence she mailed to him to support her appeal.[1]

In order to prevail on an ineffective assistance of counsel claim, Bailey must show that (1) trial counsel's representation fell below an objective standard of reasonableness and (2) "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial."

---

[1] The court notes that Bailey fails to support her Motion with facts as required by Rule 2(b) of the Rules Governing Section 2255 Proceedings. What record Bailey has submitted in support of her Motion consists of a General Appendix to her reply brief, a 52 page affidavit, and several other documents. The court further notes that the self-serving affidavit lacks evidentiary value. Virtually all the 213 points raised in the affidavit are not based on personal knowledge, lack foundation, and constitute inadmissible hearsay.

1   Strickland v. Washington, 477 U.S. 668, 685-86 (1994). In evaluating counsel's performance,
2   "there is a strong presumption that counsel's conduct falls within the wide range of reasonable
3   professional assistance." Payton v. Woodward, 258 F.3d 905, 919 (9th Cir. 2001), cert.
4   denied, 123 S.Ct. 1783 (2003). Bailey must also show that she was "actually prejudiced" by
5   counsel's errors, the mere possibility of an error is not sufficient. Id.

6   In support of her claim of ineffective assistance of counsel, Bailey has submitted a 52-
7   page document entitled "Affidavit for Motion to Vacate Pursuant to 28 U.S.C. § 2255
8   identifying 213 points of error. (Docket No. 568). In large part Docket No. 568 identifies
9   lines of questioning or the development of evidence that her counsel could have asked or
10  developed at the time of trial, but did not. (Docket No. 568). Although convoluted and
11  difficult to follow, the thrust of Bailey's story is that she is the victim of a conspiracy
12  comprised of her attorneys, work associates, the F.B.I., the C.I.A., former Soviet spy Svetlana
13  Ogorodnikova, and others who were out to get her. The individuals were motivated by money
14  (based upon a financial evaluation of a black box biofrequency device she values at $100
15  million), loyalty (in the case of F.B.I. and C.I.A. operatives who were acquaintances or friends
16  of Richard Post and have acted to protect him), and the desire to avoid being deported from
17  the United States (in the case of former Russian spy Svetlana Ogorodnikova). In broad brush,
18  Bailey alleges that she never intended to kidnap Richard Post. Rather, she only intended to
19  have him arrested in Mexico for his involvement in the smuggling of Chinese weapons, aliens
20  and drugs. While Bailey acknowledges that Richard Post was held by Iribe, she contends that
21  he was not injured. While Bailey visited Richard Post at the torture site, she believes that he
22  was not really injured. Rather, according to Bailey, the kidnaping/torture was a ruse in an
23  attempt to extort money from her. She also alleges that Post was alive and living in Cancun
24  three months after he was supposed to have been killed (in previously filed motions she
25  claimed he was seen Europe). She also explains that the jury could not have convicted her on
26  the murder for hire conviction because (1) third parties were trying to poison her and (2) the
27  hit man she hired to kill Krueger entrapped her because, among other things, he failed to
28  provide her with a "means of contacting him directly to cancel the deal (to kill Krueger and

others)." (Docket No. 458, ¶109). Bailey also speculates that the "pharmaceutical industry may be involved" in this case because her black box device "could eliminate many drugs from the market which each average $3 billion a year in sales, per drug." (Docket No. 458, ¶144). Because the black box device could eliminate the need for many pharmaceuticals, so the argument goes, the industry had an incentive to quash the marketing of such a device.

Bailey's claims of ineffective assistance of counsel fail for several reasons. First and foremost, Bailey's claims must be viewed through the lens of the overwhelming evidence of her guilt in the kidnaping and torture of Richard Post and her conduct in hiring an assassin to kill Krueger and others. The testimony presented at the time of trial – much of it in Bailey's own words – exposed Bailey's calculated, purposeful, and heinous crimes. Second, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. 689. The 213 alleged trial errors fail to rebut the presumption that her trial counsel engaged in "sound trial strategy." Id. Bailey claims that her counsel was ineffective because he failed to asked certain questions, failed to call witnesses, and failed to develop evidence that would create a reasonable doubt in the minds of the jury. These arguments fail to overcome the presumption of competence. The fact that her trial counsel was unable to create a reasonable doubt in the minds of the jury is not attributable to some perceived deficiency by counsel, but due to the development of an evidentiary record which overwhelmingly demonstrated Bailey's callous, calculated participation in carrying out the kidnaping and torture of Richard Post as well as murder for hire. Third, many of the claims made by Bailey are simply fanciful. For example, she declares that she would testify that the Government knowingly used perjured testimony and withheld evidence; the Government failed to disclose that certain trial witnesses were purportedly granted immunity from prosecution and threatened other witnesses to withhold testimony in fear of criminal prosecution; and the Government interfered with her mail. (Docket No. 568, pp. 38-47, ¶¶1-90). Notably these arguments are unsupported by any evidence, lack foundation, and are not warranted by the trial record. The court will also directly address several of Bailey's main arguments.

1    Bailey claims that she gave several boxes of documents to her former counsel, James
2 Warner, and that he subsequently lost or destroyed them. She argues that the documents would
3 have exculpated her. As with her other alleged errors, she fails to present any evidence to
4 substantiate this argument. No one saw the boxes and there is no written transmittal letter from
5 Bailey to Warner. She also contends that the jury was prevented from hearing evidence that
6 Richard Post was alive and well in Cancun, Mexico. At the time of trial, she contends that Jay
7 Walker would have testified that Skip Moschetti told Mr. Walker that Moschetti had seen him
8 alive after his kidnaping and murder. Bailey was prevented from introducing this hearsay
9 testimony. This is not ineffective assistance of counsel. The statement was inadmissible
10 hearsay under the Federal Rules of Evidence.

11    Bailey also claims that trial counsel was ineffective for failing to withdraw as counsel
12 of record and to permit her to testify. With respect to her claim that she desired to represent
13 herself mid-way through trial, Bailey cannot demonstrate any prejudice because the court
14 would not have granted any Faretta motion. Such a motion would have been denied as
15 untimely. See Moore v. Calderon, 108 F.3d 261, 264 (9th Cir. 1997) ("a request [for self-
16 representation] is timely if made before the jury is empaneled").

17    Bailey also claims her counsel was ineffective for failing to permit her to testify. At
18 some unidentified time during the trial, Bailey claims that she informed trial counsel that she
19 desired to testify. While a defendant has a right to testify in her own defense, see Untied States
20 v. Pino-Noriega, 189 F.3d 1089, 1094 (9th Cir. 1999), cert. denied, 528 U.S. 989 (1999), that
21 right may be waived either implicitly or explicitly. "A defendant is presumed to assent to [her]
22 attorney's tactical decision not to have [her] testify." Id. However, "[w]hen a defendant
23 remains silent in the face of [her] attorney's decision not to call [her] as a witness, [s]he waives
24 the right to testify." Here, Bailey did not inform the court of her purported desire to testify
25 until after the jury returned guilty verdicts. Accordingly, Bailey fails to rebut the presumption
26 that trial counsel's tactical decision not to have her testify was ineffective.

27    Bailey also claims that her prior counsel, James Warner, had an actual conflict of
28 interest because, among other things, he was involved in the management of her business.

1  Bailey cannot demonstrate any prejudice at the time of trial because Mr. Warner did not
2  represent her at the time of trial.

3  Bailey also claims that her trial counsel, Mr. DeMassa, had an actual conflict of interest
4  because he had a friendship with James Warner and that Warner and DeMassa threatened to
5  influence the judge to give Bailey life in prison if she accused them of misappropriating her
6  funds or businesses. This argument is not supported by any evidence and, given the apparent
7  fanciful nature of the claim, Bailey must support this claim with some evidence. While an
8  actual conflict of interest may be grounds to grant relief under 28 U.S.C. §2255, Bailey must
9  go beyond a self-serving declaration to create a viable issue. Furthermore, although couched
10 as an ineffective assistance of counsel claim, it appears that the standard of review of this claim
11 is the "cause and actual prejudice" standard enunciated in Davis v. United States, 411 U.S. 233
12 (1973). Bailey fails to show cause why this argument was not raised at the time of trial or to
13 demonstrate any prejudice. Consequently, this argument necessarily fails.

14 Bailey also alleges that appellate "counsel was ineffective for failing to use evidence
15 mailed to him to support" her claims. (Motion at p.6). Bailey has not addressed this argument
16 in sufficient detail, nor provided any evidence to support her claim that appellate counsel
17 possessed exculpatory evidence. Therefore Bailey fails to meet her burden on this argument.

18 In sum, Bailey was not provided ineffective assistance of counsel and the court denies
19 Ground One in its entirety.

20 **Ground Two: The Booker Claim and Judicial Bias**

21 Bailey claims that her Fifth and Sixth Amendment rights were violated under United
22 States v. Booker, 543 U.S. 220 (2005) when the court found that the victim Richard Post had
23 been killed; the court demonstrated judicial bias; the record was not sufficiently developed for
24 appeal; and the jury pool was biased against her by "the media blitz" surrounding her trial.
25 (Motion at p.6). The court notes that the standard of review for many of the claims to which
26 no contemporaneous objection was made at trial is the cause and prejudice standard. See
27 Davis, 411 U.S. 233. Each argument is discussed in turn.
28 / / /

1      The Government contends that Bailey may not raise a <u>Booker</u> claim because her appeal
2 became final on November 3, 2004, prior to the decision in <u>Booker</u>. <u>See</u> <u>United States v. Cruz</u>,
3 423 F.3d 1119 (9th Cir. 2005).  While judgment was entered by the Ninth Circuit on
4 November 3, 2004, the decision did not become final until the 90 day
5 period for filing a petition for writ of certiorari in the Supreme Court expired. <u>See</u> <u>Clay v.
6 Untied States</u>, 537 U.S. 522, 525 (2003); <u>Al-Harbi v. I.N.S.</u>, 284 F.3d 1080 (9th Cir. 2002).
7 Accordingly, <u>Booker</u>, decided on January 12, 2005, applies to the present case because the
8 judgment did not become final until about February 3, 2005.

9      Even though <u>Booker</u> applies to the present case, Bailey cannot demonstrate any
10 prejudice by the court's findings and resulting sentence because an objective reading of this
11 court's sentencing allocution discloses that the court considered relevant factors and would
12 have imposed the same sentence post <u>Booker</u>.  This is true even (1) in the absence of the
13 court's finding that Richard Post was murdered and (2) if the court had understood the
14 sentencing guidelines to be advisory.

15      As set forth at the time of sentencing,  Counts 1 and 2 were grouped under §2D1.2.
16 Instruction §2X1.1 states that the base offense level for conspiracy is the base offense level
17 from the guideline for the substantive offense, plus any adjustments from such guideline.
18 §2X1.1.  The court found  the appropriate guideline to be §2A1.1  – the first degree murder
19 guideline.  As in <u>United States v. Gamez</u>, 301 F.3d 1138 (9th Cir. 2002), the court concluded
20 that <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000) did not require the issue of Post's murder
21 to be placed before the jury because an "affirmative ruling on that issue would not result in a
22 sentence beyond the prescribed statutory maximum of life in prison for these counts." (August
23 20, 2003 TR, p. 72:10-12).  The court further found, by clear and convincing evidence, that
24 Post was murdered as a foreseeable consequence of the conspiracy to kidnap, torture, and
25 murder. Consequently the court determined that 43 represented the appropriate base offense
26 level. This court then upwardly adjusted the base offense level for Bailey's aggravated role
27 and denied all downward departure requests made by Bailey.  Thereafter the court imposed the
28 statutory maximum life sentence.  <u>See</u> 18 U.S.C. §§ 956(a)(2)(A) and 1201(a).

1     In Booker, the Supreme Court did not eliminate judicial fact-finding. Rather, to avoid 2 any Sixth Amendment issue, the Supreme Court held that the sentencing guidelines are 3 "effectively advisory." 543 U.S. at 245. In light of Booker and United States v. Ameline, 409 4 F.3d 1073 (9th Cir. 2005), the record clearly demonstrates this court's intention to impose a 5 life sentence for reasons predicated upon the relevant sentencing provisions of 18 U.S.C. 6 §3553(a).

7     At the time of sentencing, this court detailed the nature and circumstances of Bailey's 8 participation as well as her aggravated role. (August 20, 2003 TR, pp. 73-79). In effect, 9 Bailey was the engine and keystone behind the plot to kidnap and torture Richard Post. She 10 planned the mechanics of the kidnaping, provided substantial money to implement the kidnap 11 plan, and paid Iribe for the kidnaping and disposal of Richard Post's body. Bailey lured 12 Richard Post to Mexico; and the kidnaping occurred in her presence. When, following initial 13 torturing, Richard Post failed to provide any information about the missing money, Bailey 14 visited him at the torture site in a further effort to extract information from him.

15    When Bailey was informed that Richard Post could not be held any longer, and he 16 denied under torture to having embezzled any money from Bailey, she paid additional money 17 to have Iribe kill Richard Post and dispose of the body. Bailey herself provided corroborating 18 evidence in the form of whispered conversations to Ms. Ogorodnikova and later to Agent 19 McKean detailing the kidnaping of Richard Post as well as the methods of torture and Richard 20 Post's ultimate demise, including a reference that Bailey personally authorized the killing of 21 Richard Post. Further, Bailey engaged in a subterfuge to deceive Richard Post's family into 22 believing that he had purposely disappeared. Richard Post was obligated, by means of physical 23 force, to leave messages at his place of business indicating that he had left town. Bailey also 24 purported to offer a reward for information about Mr. Post's location, at the same time she 25 knew he was kidnaped, tortured, and killed.

26    When it came time in this court's sentencing allocution to address whether the ten year 27 sentence for Count 5 would be imposed consecutively or concurrently to the life term for 28 / / /

1 Counts 1 and 2, this court directly spoke to the need to protect the public from Bailey based
2 on her relevant history:

3     As to the matter of the Court imposing custody on Count 5 consecutive to the life terms imposed for Counts 1 and 2, I can only say that protection of the
4     public is paramount in this case.  Ms. Bailey has proven herself to be cold-blooded in her impulses to kill or have killed those whom she perceives to be a
5     threat to her, real or imagined, as a result of her inflated sense of self-worth, and I think it's very important to keep Ms. Bailey in custody for as long as possible.
6     I don't think any of those impulses have been in any way allayed.  Ms. Bailey has expressed no contrition, no remorse, no acknowledgement (sic) of any
7     wrongdoing, and perhaps that's the most unsettling part of all this.

8     During the course of this trial, it did become clear to the Court that Ms. Bailey has conflated her desire to serve humanity with her desire to murder
9     those with whom she [has] perceived as an obstacle to application of her personal philosophy and code, and that's why I think Ms. Bailey poses a grave
10    and serious danger to society if left to her own devices in any form.

11 (August 20, 2003 TR, pp. 87:14-88:7).

12     Under the circumstances of this case, a life sentence is entirely appropriate and
13 consistent with Federal sentencing law both prior to and after Booker.  Bailey's life sentence
14 addresses the seriousness of her conduct and serves to protect the public.

15     Bailey also argues that her constitutional rights were violated by a tainted jury pool,
16 judicial bias, and insufficiently developed record on appeal.  With respect to the jury-related
17 arguments (news articles regarding the case tainted the jury pool, high percentage of jurors
18 with ties to law enforcement, and a juror who was a potential witness in an unrelated criminal
19 case in state court) Bailey fails to show cause why the arguments were not raised at the time
20 of trial or to show any prejudice or to identify how these supposed facts or arguments impacted
21 her Fifth and Sixth Amendment rights to a fair trial.  Moreover, during jury selection, all jurors
22 were asked whether they had heard about this case or had any information concerning the case.
23 All jurors provided negative responses.  (June 18, 2003 TR, p.55:3-7).  Consequently, these
24 arguments are denied.

25     Bailey also argues that the court demonstrated judicial bias and failed to permit her to
26 develop a record on appeal.  With respect to judicial bias, this court has addressed Bailey's
27 previous motions seeking recusal and the court incorporates those orders as if fully set forth
28 herein.  The factual basis for this claim, in part, is set forth in Bailey's reply brief wherein she

represents that the "court stated that Dr. Shelton's testimony was totally discredited. (Tab A, p.54). Dr. Shelton testified that he identified a poisonous level of cyanide in Bailey." (Reply at p.8). Bailey misrepresents the record and fails to identify the context of the court's comments. In addressing Bailey's claim that she was provided with ineffective assistance of counsel, the court addressed the vigorous defense presented by trial counsel, Mr. DeMassa. The court noted that Mr. DeMassa provided an effective cross-examination of principal witnesses for the government and then stated that Mr. DeMassa called Dr. Shelton "on the question of whether or not Ms. Bailey had been subject to poisoning, environmental or otherwise, and [the court believed that Mr. DeMassa] conducted a very effective direct examination of Dr. Shelton." (August 20, 2003 TR 54:1013). The court then went on to note that it wasn't until cross-examination that it was revealed that "the blood work of Ms. Bailey largely fell into normal ranges and that Dr. Shelton could make no opinion, could state no opinion with respect to whatever Ms. Bailey's status might have been in December of 1999, the time related to the fifth count." (TR 54:15-20).

The court did not state that Dr. Shelton's testimony was totally discredited. Rather, the court stated, to the effect, that Mr. DeMassa presented an effective case on direct but that, on cross-examination, it was revealed that the blood tests relied upon by Dr. Shelton were not contemporaneous with the point in time that Bailey sought to hire an assassin to murder Krueger and others.[2] In other words, Bailey's example of bias is not demonstrated from the record.

In sum, the court denies Ground Two in its entirety.

**Ground Three: Illegal Mail Tampering**

Bailey alleges that her Fifth and Sixth Amendment rights were violated when her mail was tampered with "at critical times." (Motion at p.6). Bailey identifies that briefs and exhibits she provided to the Ninth Circuit were tampered with and/or disappeared. The court notes that this is not a proper subject of a 28 U.S.C. §2255 motion as it does not challenge her

---

[2] The court notes that virtually all of Bailey's perceived constitutional violations are not based upon any evidentiary showing but, rather, upon strained and unsupported conclusory statements.

conviction or sentence. Even if some form of "mail tampering" did occur, the court notes that such "tampering" does not appear to have hindered Bailey's access to the courts as she has filed with this court in excess of 30 motions this year alone. Accordingly, the court denies this claim as grounds for relief.

**Ground Four: Obstacles to Perfecting Appeal**

Bailey alleges her Fifth and Sixth Amendment rights were violated when she encountered obstacles to perfecting the record on appeal by filing exhibits to support her claims. Those obstacles include this court's denial for the issuance of subpoenas post-trial, evidence withheld by prior counsel, denial of FOIA requests post-trial, her confinement in administrative segregation, a broken inmate copier for four months, limitations on the use of the copier, closing the law library, illness due to lack of heat, and this court's denial of funds to copy documents. As with the previous claim, the majority of these grounds for relief are not a proper subject for 28 U.S.C. §2255 relief as they do not challenge her conviction or sentence. Notwithstanding, the court will respond to several of the arguments.

With respect to the request for issuance of post-trial subpoenas, Bailey fails to provide any authority that a convicted individual has the right to engage in post-trial discovery absent a showing of substantial or compelling need, something Bailey fails to do. With respect to her allegation that the court has denied her request for copying costs, the court notes that it has in fact repeatedly indicated its willingness to grant such funds upon "an initial threshold showing that the documents are probative and support her claims. A general claim that 'the quantity needed to prove each of her claims is 4,500 pages' [] is insufficient to warrant the expenditure of CJA funds." (Docket No. 601, Order Re: Filings of March 27, 2006; March 28, 2006; March 30, 2006, and April 3, 2006 at p.4:8-10). Accordingly, the court denies relief on Ground Four.

/ / /

/ / /

/ / /

/ / /

1   In sum, the court denies Bailey's Motion in its entirety. All other pending motions are
2 denied as moot.
3   **IT IS SO ORDERED.**
4 DATED: December 8, 2006

    _____
5                                    Hon. Jeffrey T. Miller
6                                    United States District Judge

7 cc:    All Parties

8       Kimberly Bailey
        Reg. 16149112
9       Metropolitan Correctional Center
        808 Union St.
10      San Diego, CA 92101